1  ANDRÉ BIROTTE JR
   United States Attorney
2  SANDRA R. BROWN
   Assistant United States Attorney
3  Chief, Tax Division
   DANIEL LAYTON (CA SBN 240763)
4  Assistant United States Attorney
   Room 7211 Federal Building
5  300 North Los Angeles Street
   Los Angeles, California 90012
6
   ALLYSON B. BAKER
7  D.C. Bar No.  478073
   SEAN M. GREEN
8  VA Bar No. 73560
   Trial Attorneys, Tax Division
9  U.S. Department of Justice
   Post Office Box 7238
10 Ben Franklin Station
   Washington, D.C. 20044
11 Telephone: (202) 353-8031
   Facsimile:  (202) 514-6770
12
   Attorneys for the United States
13

FILED

10 AUG 25  AM II: 51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

14      IN THE UNITED STATES DISTRICT COURT FOR THE
              CENTRAL DISTRICT OF CALIFORNIA
15                   WESTERN DIVISION

16 UNITED STATES OF AMERICA          )
                                     )
17              Plaintiff,           )
                                     )
18         v.                        )   Civil CV 10 6341-CBM
                                     )              (EA)
19 WILLIAM W. ALEXANDER,             )
   RETIREMENT PLAN SERVICES, INC.,   )
20 and LYONS PENSIONS, INC.          )
                                     )
21              Defendant.           )
                                     )

22 **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

23      Plaintiff, the United States of America, for its complaint against defendants

24 William Alexander; Retirement Plan Services, Inc.; and Lyons Pensions, Inc.

25 states as follows:

26 ///

27 ///

28

## Nature of the Action

1. Alexander individually and through his companies Retirement Plan Services and Lyons Pensions, promotes numerous tax-fraud schemes, including but not limited to schemes that involve his helping customers to use (a) a sham pension plan; and (b) a sham welfare-benefit plan.

2. The United States is bringing this complaint under 26 U.S.C. §§ 7402(a) and 7408 of the Internal Revenue Code (I.R.C.) to enjoin Alexander, Retirement Plan Services, and Lyons Pensions and anyone acting in concert with Alexander or these companies from directly or indirectly:

    a.    Organizing, promoting, marketing, or selling any plan or arrangement – including but not limited to the tax schemes described in this complaint – that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of their federal tax liabilities;

    b.    Engaging in conduct subject to penalty under I.R.C. § 6700, *i.e.*, organizing or selling any plan or arrangement and in connection therewith (a) making or furnishing false or fraudulent statements regarding the allowability of certain deductions, the excludability of income, or the securing of tax benefits derived from participation in a plan or arrangement, when he knows and/or has reason to know the statements are false or fraudulent as to a material matter or (b) making a gross valuation overstatement;

    c.    Engaging in conduct subject to penalty under I.R.C. § 6701, *i.e.*, preparing or assisting in the preparation of, or advising with respect to a document related to a matter material to the internal revenue laws that includes a position that Alexander knows will, if used, result in an understatement of tax liability;

d.   Engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws; and

e.   Aiding, assisting, and/or advising with respect to the preparation of any federal tax return or representing customers before the IRS.

3. An injunction is warranted based on Alexander's continuing conduct as a promoter of tax-fraud schemes. Alexander has been promoting tax-fraud schemes since at least the mid-1990s. Alexander's numerous tax-fraud schemes have caused substantial harm to the United States. The Internal Revenue Service is harmed because it must continuously devote limited resources to detecting and examining inaccurate returns filed by Alexander's customers, and to attempting to assess and collect unpaid taxes from those customers. The amount of tax loss caused by Alexander's promotions is conservatively estimated to be at least $30 million.

## Jurisdiction and Venue

4. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345, and by 26 U.S.C. §§ 7402(a) and 7408.

5. This action for injunctive relief is brought at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the discretion of a delegate of the Attorney General of the United States, pursuant to 26 U.S.C. §§ 7402 and 7408.

6. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this suit took place in this district.

7. Alexander does business in this district in Pasadena, California.

## Alexander's Background and Work History

8. Alexander is 60 years old and a native of Nebraska. He graduated from the University of Nebraska. He works and lives in southern California where he

1  purports to be an accountant, pension-plan administrator and a California-licensed
2  insurance broker.

3      9.  He works through Retirement Plan Services, Inc., which is a corporation
4  that was incorporated in Nevada in 1996, and Lyons Pensions, Inc., which was
5  incorporated in Nevada in 2002.  He advertises that these companies administer
6  pension plans and welfare-benefit plans.

7      10.  Alexander worked as an annuity wholesaler for a number of large
8  insurance companies from 1973 until 1993, at which time he became a self-
9  employed insurance agent.  In or around 1973, Alexander started selling purported
10  pension plans, and, during the late 1990s, Alexander started selling purported
11  welfare-benefit plans.

12      11.  Alexander had a Series 6 license with FINRA (formerly NASD) that
13  allowed him to sell annuities, mutual funds, and variable life insurance policies.
14  He no longer maintains this license.

15      12.  Alexander's customers are largely small business owners, such as
16  doctors, attorneys, and other individuals who own small businesses.  He purports
17  to be an expert in the provision of federal tax advice to small business owners.

18      13.  Alexander promotes his sham pension plans and sham welfare-benefit
19  plan tax-fraud schemes by describing himself as one of the best tax planners in the
20  country.  He tells his customers and potential customers that he is more aggressive
21  and less conservative than other accountants.

22      14.  Alexander holds himself out to his customers as an administrator of
23  pension plans and welfare-benefit plans.

24      15.  He falsely and/or fraudulently advises his customers that these sham
25  pension plans and sham welfare-benefit plans are legitimate and legal plans.

26      16.  Alexander tells his customers and potential customers that they are
27  paying too much in federal income taxes, and that he can reduce their tax burden

28                              - 4 -

so that they pay little, if any, income taxes.  He touts his sham pension-plan and welfare-benefit plan schemes as tax arrangements that allow his customers to reduce, if not eliminate entirely, their tax liabilities.

17.  Alexander encourages his customers to retain an accountant with whom he regularly works to prepare their tax returns, because these accountants follow Alexander's directions.

18.  Alexander also furnishes his customers and potential customers with a list of references – that is, a list of individual customers and also accountants to whom Alexander refers work.  He contends that these references will support his assertion that he is "one of the very best pension administrators in the area."

19.  Alexander advises potential customers that his customers are rarely, if ever, the subject of an IRS audit, and that he has particular expertise in handling such audits when they do happen.

20.  When the IRS does audit his customers' tax returns, Alexander responds on his customers' behalf by refusing to cooperate with the audit process and by sending revenue agents handwritten, vitriolic notes that impugn the agent's veracity and the audit process.  For example, Alexander handwrote a note, dated May 20, 2009, to a revenue agent who had audited his clients, Robert and Annette Adler of Woodland Hills and their company, Coastal Satellite, Inc. that purported to sponsor a pension-plan.  The agent's report determined that there was not adequate substantiation to support the pension-plan deductions that the Adlers and their company claimed during the 2007 and 2008 tax years.  Alexander sent the revenue agent a note that stated that the audit report "is 100% wrong" and that "your report is a lie & that makes you a liar. . . . I know you are presumed by your bosses to lie."  Alexander signed his handwritten note using the moniker "Big Bad/Tough Bill."

21.  Alexander charges his customers an initial fee for his purported efforts to set up their sham pension plans and sham welfare-benefit plans, and an annual registration fee for his companies' purported administration and maintenance of the sham pension plans and sham welfare-benefit plans.

22.  On information and belief, Alexander also has signed tax returns forging the signature of a deceased accountant and using that deceased accountant's tax return preparer identification number.

## SHAM PENSION-PLAN TAX-FRAUD SCHEME

23.  Alexander promotes a sham pension-plan scheme through his corporations Retirement Plan Services, Inc. and Lyons Pensions Plan, Inc., which are incorporated in Nevada.  Alexander is the only officer, director and employee of each company.

24.  Alexander advises his customers to have their small businesses adopt a qualified, single-employer, defined-benefit pension plan.

25.  Alexander advertises that his pension plans offer customers large tax savings. Alexander told one potential customer, Glen Martin, a general practitioner doctor in California, that "if your net income was $300K, your current accountant would probably have you pay $100,000 to $150,000 in tax.  With me as your accountant and pension-plan administrator, I would have you pay $5,000 to $20,000 in tax." Alexander explained to Martin that his tax liability would disappear because Alexander could take "$300 K of net income and move $200 K to $250 K through pension plans and that would basically eliminate your income tax and your self-employment tax."

26.  A pension plan is a financial arrangement that is designed to provide a source of retirement funding for employees.  Employers create, maintain and fund pension plans for the benefit of their employees who become eligible to receive payments from these plans at retirement.  An employer makes contributions to that

pension plan on behalf of an employee and in this way transfers a portion of that employee's income to the pension plan, where these funds accrue tax-free until that employee uses them at retirement. The Internal Revenue Code provides tax advantages to employers who maintain pension plans, provided that these plans are qualified plans, meaning they meet certain requirements prescribed by the Code. One tax advantage is that funds accrue tax-free within a pension plan, and an employer can deduct its contributions paid to the pension plan.

27. There are different types of qualified pension plans, including plans that a number of employers maintain (multiple-employer plans) and pension plans that only a single employer maintains (single-employer plans). Pension plans also are divided into categories: defined- benefit plans and defined-contribution plans. A defined-benefit plan is a pension plan that offers its beneficiaries (the sponsoring company's employees) guaranteed payments at retirement that do not depend on the relative return on the investments funding the pension plan; rather, the amount of payment depends on certain pre-established factors, such as the length of time that the employee works for the sponsoring company and the salary that the employee receives from the company during his or her employment. A defined-contribution plan accumulates contributions in an employee's account that make up the retirement benefit.

28. Generally, the funds transferred to the pension plan are held in trust for the benefit of the employees participating in the pension plan. The business sponsoring the pension plan is, in effect, the grantor of the trust forming part of the pension plan. The participating employees are, in effect, the beneficiaries of the trust forming part of the pension plan.

29. When a pension plan is established, its terms, including the amount of contribution the employer makes for each employee, and the formula used to

1  calculate the payments an employee receives at retirement, are established through

2  a pension-plan document, which includes an adoption agreement.

3  **Establishing And Purporting To Adopt A Qualified Pension Plan**

4       30.  To implement the sham pension-plan tax-fraud scheme, in many

5  instances Alexander advises his customers to create a new corporation, usually an

6  S corporation, which is a pass-through entity.  This corporation becomes the

7  purported sponsor of the sham pension plan.  An S corporation is not taxed at the

8  corporate level.  Rather, its income and any claimed deductions pass through to

9  the owners of that corporation who report that income and claim those deductions

10  on their individual tax returns.

11       31.  For example, Alexander helped one customer, Steven Weinstein of

12  Indianapolis, Indiana, form an S corporation, Nacho Money, Inc. that became the

13  sponsor of a sham pension plan.  Nacho Money purports to provide consulting

14  services to Weinstein's company, Recognition Services, Inc.  Nacho Money is

15  owned by a Weinstein family member, but Weinstein actually controls Nacho

16  Money and the company's funds.  Nacho Money deducted purported pension-plan

17  contributions of approximately $375,000 in 2005; $455,000 in 2006; and

18  $415,000 in 2007.  The IRS disallowed these deductions because the IRS

19  determined that the pension plan was not a qualified plan and that the purported

20  contributions made to that plan and corresponding deductions taken by Weinstein

21  should be disallowed.

22       32.  Next, Alexander advises his customers to purport to adopt a single-

23  employer, defined-benefit pension-plan document.

24       33.  The parameters of the pension plan that he advises all of his customers

25  to adopt are defined in a pension-plan document drafted and created by pension-

26  plan administrators, including Industry Consultants, Inc.  The pension plan

27  described in the plan document is a pre-approved plan, meaning that if the plan's

28                                        - 8 -

parameters, as described in the plan document, are adopted by an employer and adhered to by the employer, then the plan is accepted to be a qualified plan under the Internal Revenue Code.

34. Alexander advises his customers to sign plan-document adoption agreements that are often backdated, meaning that the plan purports to take effect at a date earlier than when Alexander's customers actually have executed these plan documents. Alexander also advises his customers to amend their federal income tax returns for prior years in order to claim as deductions sham pension-plan contributions they purport to (retroactively) make, due to signing unlawfully backdated pension plans.

35. Alexander customer Steven Weinstein's sham pension-plan was purportedly established on January 1, 2000. But the purported sponsor of that plan, Nacho Money, Inc. (an S corporation created for the purpose of sponsoring this plan), was not incorporated until sixteen months later in early 2002.

36. Alexander told his customer Regina DiMartino of Los Angeles, California in an October 4, 2005 letter that she should date the checks that she was using to purportedly fund her sham pension plan September 15, 2004 or earlier, so that these checks could be used for a purported pension-plan contribution made for the 2004 tax year. Alexander gave DiMartino this advice after meeting with her in October of 2005.

37. As part of the sham pension-plan tax-fraud scheme, Alexander also advises his customers to establish a sham pension-plan trust. Typically, Alexander applies to the IRS for a federal pension plan employer-identification number for the trust. When he files this application with the IRS, Alexander often uses his own address on the application form, in lieu of his customers' addresses.

38. After the IRS assigns a separate employer-identification number to the sham pension-plan trust, Alexander directs his customers, who are the designated

trustees for the pension trust, to open trust bank accounts. The funds in these accounts are sometimes used to purchase financial products, including annuities and insurance contracts. These financial products are purportedly purchased to fund the pension plans.

39. Alexander advises his customers to write checks to the sham pension-plan trust. That check is deposited into the purported pension trust's bank account. Often, the funds are used to purchase insurance policies, annuities or other financial instruments, all of which fund the sham pension plan. Alexander receives a commission from the sales of these insurance policies or annuities, because he is the insurance broker who sells these policies to his customers.

40. Alexander fraudulently recharacterizes his customers' routine expenses as pension-plan contributions that purport to substantiate deductions taken retroactively on his customers' individual and corporate returns as purported pension-plan contributions.

41. Alexander also informed his customer DiMartino in a July 12, 2004 letter that between $50,000 and $60,000 of funds she had used as a down payment on her condominium had been "recharacterize[d] . . . as a defined benefit contribution for 12-31-03."

42. Similarly, in an August 28, 2004 letter, Alexander advised two customers, Dimiter Hristov and Tzonka Hristov, a married couple who are Florida-based doctors "to look for old personal checks that you wrote from 1/1/02 through 9/15/03 that are personal checks that I could re-characterize as pension contributions." He advised that these checks could be for things like "down payments on property, checks to people, investment checks, big checks to buy certain things like antique furniture."

43. A pension plan's funds accrue on a tax-free basis, provided that the pension plan is a qualified plan under the Internal Revenue Code, and meets

- 10 -

certain requirements.  Alexander promotes pension plans that purport to be
qualified plans, and thus, exempt from federal income taxes.

44.  In actuality, Alexander's customers, who act on his advice, fail to
implement the pension plans that they purport to adopt.  As discussed below, these
pension plans are shams, not bona fide plans or qualified plans within the meaning
of the Internal Revenue Code.

45.  Nevertheless, Alexander charges his customers an initial fee of
approximately $2700 for setting up the plan, and he also charges them an annual
fee of approximately $1200 for his purported annual administration of their sham
pension plans, which he purports to do through his company, Retirement Plan
Services.  Alexander purports to be the plan administrator, but in actuality, he is
not the plan administrator.  No plan administrator exists.

**Alexander's Sham Pension Plans Are Not Legitimate Pension Plans**

46.  The sham pension plans that Alexander promotes are not legitimate
pension plans.  Alexander advises his customers that they need not adhere to the
pension-plan document that they purport to adopt.  Among other things, these
sham plans are not properly funded and they do not provide adequate coverage for
Alexander customers' employees, per the requirements of any qualified pension
plan.

47.  Thus, although these pension-plan documents describe pension plans
that are pre-qualified plans, by not following the pension-plan document, his
customers' plans are not qualified for the favorable tax treatment granted to
qualified pension plans under the Internal Revenue Code.

48.  Alexander's advice concerning the sham pension-plan tax-fraud scheme
that he promotes flagrantly violates numerous provisions of the Internal Revenue
Code:  1) Alexander's sham pension plans do not adhere to the Code provisions
that regulate the methods by which a qualified pension plan must be funded;  2)

- 11 -

1  Alexander's sham pension plans do not adhere to the requirement that

2  contributions to qualified plans must be determined by a certified actuarial

3  calculation; 3) Alexander's customers deduct contributions to the sham pension

4  plan that exceed any reasonable actuarial calculation; 4) Alexander's sham

5  pension plans do not file annual reports with the Internal Revenue Service and

6  Department of Labor; 5) Alexander's sham pension plans do not adhere to the

7  requirement that plans benefit a substantial percentage of a business's non-highly

8  compensated employees, that is its rank-and-file employees.

9       49.  There is a minimum-funding requirement for qualified pension plans.

10  The amount of the contribution to the pension plan must be determined by an

11  actuarial calculation.  All qualified pension plans must be certified by an actuary

12  during each tax year.  *See* I.R.C. §§ 412(a), 430(a).

13      50.  Specifically, for plan years ending on or before December 31, 2007, the

14  Code requires that an employer that maintains a pension plan must obtain an

15  Actuarial Valuation Report from an enrolled actuary each year.  The enrolled

16  actuary must prepare and sign a Schedule B, Actuarial Information, certifying the

17  contribution required to meet the minimum funding standard under section 412 of

18  the Code.  The Schedule B is then attached to Form 5500, Annual Report of

19  Employment Plan, and filed with the IRS and the Department of Labor.  If a plan

20  sponsor fails to file Form 5500, including Schedule B, in a timely manner, the plan

21  sponsor is liable for a penalty under I.R.C. § 6059(b).  For plan years ending on or

22  after January 1, 2008, the Pension Protection Act of 2006 (P.L. 109-280), which

23  added section 430 to the Code, requires the plan actuary to determine the

24  minimum required contribution for the plan year. The actuary must certify this

25  amount on Schedule SB, which the plan administrator then attaches to the Form

26  5500 filed by the plan administrator.  Failure to file Form 5500,

27

28                                         - 12 -

1   including Schedule SB, in a timely manner, may cause the plan sponsor to incur a

2   penalty under I.R.C. § 6059(b).

3       51. Alexander ignores these actuarial calculation rules. He almost never

4   files an actuarial report or Form 5500. Additionally, Alexander and his

5   companies, Retirement Plan Service and Lyons Pensions, almost never employ an

6   actuary in connection with any of the pension plans he purports to administer.

7   Alexander has admitted that he does not get actuarial calculations each year for his

8   customers' plans. He admitted this in his October 1, 2006 letter to his customer

9   Greg Becker, who resides in Las Vegas, Nevada.

10      52. In that same letter, Alexander also advised Becker, as he has numerous

11  other customers, that Becker should not worry about obtaining an actuarial

12  calculation to determine the target amount of qualified pension-plan contributions.

13      53. Alexander determines his customers' purported pension-plan

14  contributions only by considering whether his customers are able to reduce, or

15  eliminate entirely, their tax liabilities.

16      54. For example, Alexander has determined the pension-plan contributions

17  and corresponding deductions for his customer James Shadlaus, who is based in

18  Las Vegas, since 1997 when Alexander first established a sham pension plan for

19  Shadlaus. At the end of each tax year, Alexander has determined Shadlaus's

20  annual purported pension-plan contribution by considering the year-end profits

21  Shadlaus's company earns. Alexander seeks to offset these profits with

22  deductions claimed for purported pension-plan contributions.

23      55. A business is entitled to deduct the amount of money that it contributes

24  to a defined- pension-plan, subject to limits that are outlined in the Internal

25  Revenue Code. *See* I.R.C. §§ 162, 404(o).

26      56. Alexander ignores these deduction limits as well. Here, too, Alexander

27  determines the corresponding deductions that his customers' businesses can claim

28                                      - 13 -

1   for purported contributions to their sham pension plans by considering the amount

2   of deductions that are necessary to eliminate or substantially reduce his customers'

3   tax liabilities.

4          57.  In one such instance, Alexander advised his customers, the Hristovs,

5   that he was endeavoring "to come up with enough pension deductions for 12/03 to

6   get your income tax down, as I would work things out to where you have about

7   $150K of taxable income, which would take about $500K of pension deductions

8   for '03."

9          58.  The Department of Labor and the Internal Revenue Service require that

10  a Form 5500 be filed for each qualified pension plan every year, assuming that the

11  plan comprises assets valued at or greater than $100,000.  In addition, the

12  Schedule B of the Form 5500 requires that an enrolled actuary sign the form

13  attesting to the actuarial calculations underlying the pension plan, which are used

14  to determine, among other things, the maximum contributions allowed for each

15  employee and the corresponding deductions that a business may claim.

16         59.  Nearly all, if not all, of Alexander's customers maintain sham pension

17  plans with funds that are valued at or greater than $100,000.  Yet, Alexander

18  ignores the Form 5500 filing requirement.  He represents to his customers that he

19  is their pension-plan administrator and that he will file all necessary forms with

20  government agencies.  In actuality, Alexander rarely files the Forms 5500 for his

21  customers.

22         60.  Alexander advises his customers that neither the IRS nor the

23  Department of Labor is ever likely to learn that these Form 5500s are not filed.  To

24  the extent Alexander ever files Forms 5500 with the Internal Revenue Service and

25  Department of Labor, he does so only *after* a customer is audited by the IRS.

26         61.  For example, in his October 1, 2006 letter to his customer Greg Becker,

27  Alexander acknowledged that he had not filed any of Becker's Form 5500s, even

28                                            - 14 -

though he had told Becker that he would file these forms.  Alexander explained to Becker that "[i]t would be pretty tough" for these agencies [the IRS and Department of Labor] to audit these sham pension plans "because they can't be auditing something that has never been filed."  He further advised Becker "not to file [a Form 5500] and just stay like you're doing" and that the sham pension plan "is qualified and legal."

62.  Alexander contends that a Form 5500 is simply an "information government filing," and a "disclosure that's overemphasized."  He asserts that when taxpayers or their representatives file and "honestly complete" a Form 5500, that taxpayers "increase [their] chance[s] of audit of the 5500 by a lot."

63.  Alexander's sham pension-plan tax-fraud scheme is designed so that only his business-owner customers receive coverage from the plan, regardless of whether his customers also have employees. This exclusion violates two pension-plan coverage rules: first, the rule requiring that a qualified pension plan cover a certain percentage of a company's non-highly compensated employees (which necessarily includes more than just a company's owners, officers, and directors), and second, the rule prohibiting a qualified pension plan from providing benefits disproportionately to highly-compensated employees relative to rank-and-file employees.  *See* I.R.C. §§ 410, 401(a)(3), 401(a)(4).

64.  These pension-plan coverage rules pertain to employees who work for related companies, including companies owned or controlled by the same individual or group of individuals.  The Code has control-group rules that consider whether a company is related to another company.  If two or more companies are controlled by the same individual or group of individuals, then the employees of those companies are counted together for purposes of determining whether a qualified pension plan provides benefits to an adequate percentage of non-highly compensated employees or disproportionately to highly-compensated employees.

- 15 -

1  | *See* I.R.C. §§ 414(b),(c), and 1563.

2  |     65. Alexander attempts to circumvent these coverage rules and he ignores

3  | the control-group and aggregation rules. In some instances, Alexander advises his

4  | customers to form new companies that purport to sponsor the sham pension-plans.

5  | Only his customers work for these newly formed companies. His customers'

6  | employees remain at the initial business; this arrangement is intended to give the

7  | impression that his customers own companies that have no other employees but

8  | the customers themselves, thus exempting these businesses from sponsoring

9  | qualified pension plans that meet the Code's coverage rules described in

10 | paragraphs 63 and 64. In actuality, however, the new companies that Alexander

11 | advises customers to form are part of the same control group of companies as the

12 | customers' original business. Thus, these sham pension plans cannot provide

13 | benefits only to Alexander's customers and ignore employees of the original

14 | business.

15 |     66. Alexander touts this illegal exclusion of rank-and-file employees. He

16 | explains that in establishing the sham pension plans for his customers, his

17 | "objective would be to exclude employees," as he noted in his July 20, 1997 letter

18 | to a customer whom he called Charlie. He offered the same explanation to his

19 | customer Glenn Martin in an April 17, 2004 letter: "What do I do with the

20 | employees? I typically have the employees and their payroll on a separate

21 | corporation away from the owner, so I can exclude the employees from this rich

22 | pension plan[] that I use for the owner."

23 |     67. These sham pension plans violate coverage rules described in

24 | paragraphs 63 and 64, and thus, for this reason, too, are not qualified plans within

25 | the meaning of the Code.

- 16 -

### Funding Sham Pension Plans and Characterizing Wages as Plan Contributions in Order to Evade Employment Taxes

68.   Alexander advises his customers to maximize their contributions to their pension-plan trust accounts in order to reduce or eliminate their individual and corporate federal income tax liabilities by increasing the purported plan deductions their businesses claim in connection with having made purported pension-plan contributions.

69.   For example, in the April 17, 2004 letter to Martin, Alexander advised Martin to stop paying himself a salary and instead have "most of [his] net income contributed to pension plans where [he would] pay no tax, and have some paid to [him] as corporate profit, which would be subject to income tax but no self-employment tax."  Alexander further advised Martin that by using Alexander as an "accountant and pension plan administrator, [he] would probably have [Martin] pay $5,000 to $20,000 in tax[es]," whereas Martin's current accountant would have Martin pay "$100,000 to $150,000 in tax[es]."

70.   Alexander also advises his customers not to take a salary from their businesses.  In this way, Alexander advises his customers that they can avoid paying federal income taxes and employment taxes on their wages.

71.   Alexander advises his customers that if they no longer pay themselves a salary, but still need funds to cover their living expenses, they can take a purported third-party loan from the sham pension-plan fund.  These purported loans are also shams.

72.   In an August 5, 2003 letter to his customer Gregory Becker, Alexander explained that the "pension deduction is a 'wild card' expense, which means that we can make it just about anything you want to make it and still get the money back through loans so you have use of the money as a large pension contribution [but it] doesn't hurt your cash flow."

- 17 -

73. Alexander's customers write him a check, he takes a commission, and then returns his customers' funds, minus his commission and informs his customers that they never need to repay the so-called loan. Alexander intends to make this transaction appear to be more elaborate and complex.

74. For example, to effect this bogus third-party loan, Alexander has advised at least one customer to write a check to a seemingly-unrelated third-party, such as "a sibling, any relative or any business associate you trust," but then further explained that "[b]ecause this sometimes gets a little uneasy with regards to asking someone to make a loan to them where they give the money right back to you, most of my customers use me as the 'front for the loan.'" Thus, Alexander advises customers to write a check to Lyons Pensions, an entity that he operates and that purports to be a pension-plan administrator or to write a check to themselves, with a notation that the check is for a purported loan to William Alexander. Alexander then negotiates the check, takes a  commission that is approximately 6%, and returns the remainder of the funds, minus this commission, to the customer. Alexander even promises customers that in the event of an IRS audit, he will be able to reproduce actual loan documents to verify this purported third-party loan.

75. Alexander actively maneuvers to give the appearance that this movement of money is a third-party loan. This is because the rules governing the terms of third-party loans made from pension-plans are more flexible than the rules governing non-third-party loans. Third-party loans are subject to fewer rules and also less IRS scrutiny. *See* I.R.C. §§ 4975(c)(e).

76. Of course, these purported third-party loans are not loans at all. They are actually the salaries that Alexander's customers would ordinarily pay themselves, but for his scheme. In short, these bogus loans are used to disguise the salaries that Alexander's customers earn and on which they are required to pay

1    income taxes and employment taxes.

2         77. Alexander even goes so far as "to set up a third-party loan note for the

3    file to keep the IRS happy in the remote possibility that they do a pension audit,"

4    as he explained to his customer Regina DiMartino in an October 4, 2005 letter in

5    which he touts his sham pension-plan tax-fraud scheme.  He describes the third-

6    party loan option to DiMartino by further explaining that "[y]ou put your first

7    $200K into the annuity loan by writing a check to my agency corp, Lyons

8    Pensions, Inc.  I hold the money in my annuity agency corp for a couple of weeks

9    and refund the $200K back to you. . . . You can then take this money and invest it

10   anywhere. . . . Then the investment growth and gains are not subject to income

11   tax."

12        78. Thus, Alexander advises his customers to recharacterize their salaries as

13   pension-plan contributions which are then returned to the customer via a third-

14   party loan.  As a result of this advice, Alexander's customers claim a bogus

15   deduction on their tax returns for the purported contributions to a sham pension

16   plan, pay neither income taxes nor employment taxes, but still retain the use of

17   these funds in order to cover their living expenses.  In addition, Alexander's

18   customers also do not pay any taxes on the gains they receive from their

19   investments of these funds.  In short, Alexander advises his customers to call their

20   salaries purported pension-plan contributions in order to evade income and

21   employment tax liabilities.

22              **Alexander's False and Fraudulent Statements Regarding His
                                    Sham Pension Plans**

23        79. Alexander advises his customers that when they adopt and fund sham

24   defined-benefit pension plans through purported contributions, they are obtaining

25   certain tax benefits.  He makes numerous false and/or fraudulent material

26   statements about the purported tax benefits that derive from the sham pension-plan

27

28                                        - 19 -

arrangement that he has established and organized, including that this arrangement is legal. In addition, he makes the following false and/or fraudulent material statements:

80. First, Alexander falsely and/or fraudulently tells his customers that he, through one of his two companies, Retirement Plan Services or Lyons Pensions, is a pension-plan administrator and that he will file Forms 5500 with the IRS and Department of Labor. In actuality, Alexander's companies are not pension-plan administrators, and he does not file Forms 5500 for his customers' plans with any agency.

81. Second, Alexander falsely and/or fraudulently tells his customers that, as purported employees of the company that sponsors the sham pension plan, they need not claim the contributions to their sham pension plans as income on their tax returns, because the Internal Revenue Code does not consider contributions to a qualified pension plan to be income. But, as explained above, these pension-plan contributions are not actual contributions and there is no legitimate pension plan. Thus, Alexander advises his customers to hide their income in order to evade taxes.

82. Third, Alexander falsely and/or fraudulently tells his customers that they can take purported third-party loans from their own sham pension-plan funds, never repay these loans and still claim a deduction for having purportedly made a contribution to these sham pension plans. These purported third-party loans are not loans, and there is no legitimate pension plan.

83. Fourth, Alexander falsely and/or fraudulently tells his customers that they can contribute to their sham pension plans an amount of money that is determined by considering only whether his customers can reduce or eliminate their tax liabilities, and with no regard for any actuarial calculation that is supposed to determine the amount of pension-plan contributions each year.

- 20 -

1    Indeed, Alexander never employs any actuarial calculation.  The Code expressly

2    requires that pension-plan contributions comport with an actual actuarial

3    calculation.

4        84.  Fifth, Alexander falsely and/or fraudulently tells his customers that they

5    can claim corresponding deductions for the purported contributions they made to

6    their sham pension plans, without any regard for any actuarial calculations.  The

7    Code expressly requires that corresponding deductions comport with an actual

8    actuarial calculation.

9        85.  Sixth, Alexander falsely and/or fraudulently tells his customers that

10    they can take a purported third-party loan that they need not pay back in order to

11    cover their living expenses instead of paying themselves a salary, in order to evade

12    the payment of income taxes and employment taxes.  These transactions illegally

13    recharacterize income.

14        86.  Alexander knows and has reason to know that all of these statements

15    are false and/or fraudulent statements.

16       **SHAM WELFARE-BENEFIT PLAN TAX-FRAUD SCHEME**

17        87.  Alexander also promotes a sham welfare-benefit plan tax-fraud scheme

18    as an additional way to unlawfully eliminate or reduce his customers' tax

19    liabilities.  Specifically, he advises his customers to adopt a welfare-benefit plan

20    that has been defunct since 2003.  His sham welfare-benefit plan tax-fraud scheme

21    is promoted along with the sham pension-plan tax-fraud scheme.

22        88.  The new S corporation that Alexander advises his customers to form in

23    connection with the sham pension-plan tax-fraud scheme also purports to sponsor

24    the sham welfare-benefit plan that Alexander promotes.

25        89.  A welfare-benefit plan is a plan that is established or maintained by an

26    employer, multiple employers, or an employee organization that provides benefits

27    to its employees and/or their beneficiaries, such as insured and uninsured medical

28

1   and death benefits for active employees, disability and unemployment benefits,
2   certain severance benefits, and post-retirement medical and life-insurance benefits.

3       90.  A welfare-benefit plan is funded through contributions, which the
4   sponsoring employer (and, sometimes the employer's employees) makes to a
5   welfare-benefit fund, usually a trust.  This fund then uses these contributions
6   either to directly provide the benefits covered by the welfare-benefit plan or to
7   purchase insurance contracts to provide the benefits.  Contributions to the welfare-
8   benefit fund, if deductible at all, are generally deductible by the employer in the
9   taxable year that the welfare benefits are provided to the covered employees.  *See*
10  I.R.C. § 419.

11      91.  Alexander has advised customers to have their businesses sign the
12  Warren Group Multiple Employer Welfare Benefit Plan and Trust adoption
13  agreement, thus giving the appearance that this specific adoption agreement
14  governs their sham welfare-benefit plans.  When it existed, the Warren Group plan
15  provided, among other things, death benefits for covered employees.

16      92.  In an April 7, 2004 note, Alexander advised his clients Dimiter Hristov
17  and Tzonka Hristov that he would establish a welfare-benefit plan on their behalf.
18  This welfare-benefit plan was purportedly the Warren Group plan, which was
19  defunct at the time of Alexander's letter.

20      93.  The Warren Group no longer operates a welfare-benefit plan, as the
21  group has been defunct since 2003.  This means that after 2003, there were no new
22  participants allowed into the Warren Group plan.

23      94.  For example, there is no record that Alexander's customers James
24  Shadlaus and the Hristovs ever participated in the Warren Group plan, even
25  though Alexander purported to establish welfare-benefit plans for them.

26      95.  Seven years after the Warren Group plan became defunct, Alexander
27  continues to advise customers to sign the Warren Group adoption agreement to

28      - 22 -

1  give the appearance that his customers are participating in a legitimate welfare-
2  benefit plan.

3    96.  Alexander advises his customers to purport to make contributions to
4  this defunct welfare-benefit plan and to claim corresponding deductions for these
5  purported contributions on their federal tax returns.  In actuality, Alexander's
6  customers have never contributed to the Warren Group's welfare-benefit plan.

7    97.  One Alexander customer, Shashi Sharma, a cardiologist based in
8  California, purportedly participated in the sham welfare-benefit plan but when
9  asked by the IRS about his plan said he had never even heard of the Warren
10  Group.  Sharma never received any correspondence from the Warren Group, never
11  wrote any checks to the Warren Group, and never received any payments from the
12  Warren Group.

13    98.  Just as he does with his sham pension-plan tax-fraud scheme,
14  Alexander advises his customers to backdate the adoption agreements that they
15  sign, so that the welfare-benefit plan purports to take effect at a date earlier than
16  when Alexander's customers actually execute these adoption agreements.
17  Alexander also advises his customers that they should amend their federal income
18  tax returns from prior years in order to claim deductions for purported welfare-
19  benefit plan contributions.  These purported contributions are actually routine
20  expenses that his customers previously paid before they executed the unlawfully
21  backdated adoption agreements.

## Funding Sham Welfare Benefit Plans and Recharacterizing Wages
## To Evade Payment Of Employment Taxes

22
23    99.  Alexander used to advise his customers to purport to purchase annuities
24  from Jackson National Life Insurance Company that were purportedly intended to
25  fund the welfare-benefit plans.  On information and belief, Alexander promoted
26  this version of the sham welfare- benefit plan tax-fraud scheme until around 2006.
27

28                                    - 23 -

100. In this first version of the sham welfare-benefit plan tax-fraud scheme, Alexander, who previously had an insurance-brokerage license, purchased annuities from Jackson National Life for his customers, using their money. Then, almost immediately after he purchased these annuities for his customers, he sold these annuities for his customers. He then returned to his customers the money that they had used to purchase the annuities, minus an 8% annuity- surrender fee. Jackson National imposed this annuity-surrender fee because Alexander's customers canceled their annuity contracts before expiration of the term of these contracts. Alexander has explained that his customers agreed to pay the 8% surrender fee because his customers received a 40%-50% reduction in their tax liabilities as a function of participating in this tax-fraud scheme.

101. Alexander advised his customers that they could use the cash from the sales of these annuities to cover their living expenses, but that his customers could still claim a deduction for having made purported contributions to the sham welfare-benefit plans. Thus, Alexander's customers appeared to purchase annuities used to fund their purported welfare-benefit plans, but his customers retained use of their money, minus an 8% commission and fraudulently obtained tax benefits from having purportedly contributed to the sham welfare-benefit plan.

102. Alexander no longer advises his customers to purchase annuities for the purported purpose of funding the sham welfare-benefit plan. Now, Alexander advises his customers to purport to make a contribution to the sham welfare-benefit plan by writing him, or his firm Lyons Pensions, a check for the contribution amount. That check is then cashed and the funds are returned to the customer, minus a commission, similar to the third-party loan arrangement he promotes with his sham pension-plan tax-fraud scheme. Alexander advises his customers that they can spend this cash without limitation.

103. Alexander also encourages sham loans from the sham welfare-benefit plans, even though he clearly knows that this is illegal. For example, he told his customer Regina DiMartino in a July 12, 2004 letter that the "419 [welfare-benefit plan] money is supposed to be kept for retirement and not borrowed-out, but I am aggressive, so if an emergency did come along, I will get the money out for you, just like I do with the defined benefit [pension-plan] money, keeping in mind that the defined benefit allows for loans while technically the 419 is really not supposed to."

104. Alexander advised his customer Shashi Sharma that he should write Alexander a check. Alexander then returned to Sharma those funds, minus a 6½% commission Alexander retained for himself, and Alexander advised Sharma that he could use those funds to purchase properties but still claim a deduction for having contributed to a welfare-benefit plan. In 2004 and 2005, Sharma wrote Alexander and Lyons Pensions three or four checks for this purpose, based on Alexander's advice. Sharma says that Alexander's representations to Sharma caused Sharma to believe that Lyons Pensions was the welfare-benefit plan.

105. Alexander promises his customers that he can substantiate the purported loans made to customers with loan documents in the event of an IRS audit. Alexander drafted a purported third-party loan agreement for his customers the Hristovs in which Alexander's company Lyons Pensions purported to borrow $220,000 from the sham multiple-employer welfare-benefit plan and purported to promise to "repay this loan with 4% annual interest with all interest and principal paid back in a lump sum ten years from today on October 6, 2014." Alexander then signed the document, which purportedly was executed on October 6, 2004. In actuality, these customers simply received their $220,000 back, minus Alexander's commission. Furthermore, these customers never invested these returned monies in any annuities to fund the sham welfare-benefit plan.

106.  Alexander also drafted a purported third-party loan agreement for his customer Shashi Sharma's purported 419 welfare-benefit plan.  This so-called loan agreement is dated December 11, 2004, is signed by Alexander and states that "Lyons Pensions, Inc. borrowed $350,625 from the above plan on December 11, 2004," and that "I [Alexander] promise to repay this loan in ten years with $5 annual interests with all interest and principal due back in a lump-sum on December 11, 2014."  In actuality, Sharma received the money back, minus Alexander's commission.  There was no loan.

107.  Alexander advises his customers that after he returns their funds to them (minus his commission), they can invest the funds however they want and still claim a tax deduction for having contributed to a purported welfare-benefit plan.  He also advises his customers that they need to maintain certain paperwork in order to give the appearance that they have maintained a legitimate welfare-benefit plan.

108.  Alexander advises his customers that they can, as a result of drawing funds from their business by means of these sham loans, avoid paying federal income taxes and federal employment taxes, because the customers are not paying themselves any salary.

### Alexander's False And Fraudulent Statements Regarding His Sham Welfare-Benefit Plans

109.  Alexander advises his customers that when they adopt and fund a sham welfare-benefit plan through purported contributions, they are obtaining certain tax benefits.  He makes numerous false and/or fraudulent material statements about the purported tax benefits that derive from the sham welfare-benefit plan arrangement that he has established and organized, including that this arrangement is legal.  Alexander makes the following false and/or fraudulent material statements about tax benefits:

- 26 -

110. First, he falsely and/or fraudulently tells his customers that they are adopting and contributing to the Warren Group Multiple Employer Welfare Benefit Plan and Trust agreement. In actuality, the Warren Group's plan is defunct, and has been defunct since 2003.

111. Second, Alexander falsely and/or fraudulently tells his customers that the sham multiple-employer welfare-benefit plan that he promotes is a legitimate and operating welfare-benefit plan within the meaning of the Code. This plan is not legitimate and it is not actually operating.

112. Third, Alexander falsely and/or fraudulently tells his customers that they can take a deduction for having made a purported contribution to an active welfare-benefit plan. In actuality, Alexander's customers simply write him or his company a check. Alexander then returns the money to the customer, minus a commission. This is not a welfare-benefit plan contribution, and there is no legitimate welfare-benefit plan; it is an illegal income tax avoidance scheme.

113. Alexander knows and has reason to know that all of these statements are false and/or fraudulent.

## HARM TO THE UNITED STATES

114. For at least a decade, Alexander has promoted and continues to promote the sham pension-plan tax-fraud scheme and the sham welfare-benefit plan tax-fraud scheme.

115. These schemes have caused substantial harm to the United States by helping taxpayers evade taxes and obstruct the IRS' efforts to administer the federal tax laws.

116. The United States also is harmed because the IRS must continually devote limited resources to detecting and examining inaccurate returns filed by Alexander's customers, and in attempting to assess and collect unpaid taxes.

117. It is estimated that Alexander's promotion of the sham pension plans

- 27 -

1   and sham welfare-benefit plan tax-fraud schemes has resulted in at least $30

2   million in harm to the United States.  This number is a conservative estimate, as it

3   is based only on a review of tax returns for twenty-four different groups of

4   Alexander customers during the 2003-2007 tax years.

5   **COUNT I:  Injunction Under I.R.C. § 7408 for Violation of I.R.C.**
    **§§ 6700 and 6701**

6   118.  The United States incorporates by reference the allegations in

7   paragraphs 1 through  117.

8   119.  Section 7408 of the I.R.C. authorizes a court to enjoin persons who

9   have engaged in any conduct subject to penalty under I.R.C §§ 6700 or 6701 if the

10  court finds that injunctive relief is appropriate to prevent recurrence of such

11  conduct.

12  120.  Section 6700 of the I.R.C. penalizes any person who organizes or sells

13  a plan or arrangement and in connection therewith makes or furnishes or causes

14  another person to make or furnish a statement regarding the securing of a tax

15  benefit that the person knows or has reason to know is false or fraudulent as to any

16  material matter.

17  121.  Through his promotion of the sham pension-plan and sham welfare-

18  benefit plan tax-fraud schemes, Alexander has made, caused others to make and

19  furnished material false or fraudulent statements regarding the allowability of

20  certain deductions, the excludability of income, and the securing of tax benefits

21  derived from participation in one or more of these tax-fraud schemes.  Alexander

22  knows or has reason to know that these statements are false or fraudulent within

23  the meaning of I.R.C. § 6700.

24  122.  Section 6701 of the I.R.C. penalizes any person who prepares or aids,

25  assists, or advises with respect to the preparation of a document that he has reason

26  to believe will be used in connection with any material matter arising under the

27

28                                           - 28 -

1    internal revenue laws and who knows that the document, if so used, would result
2    in an understatement of another person's tax liability.

3          123.  Alexander  prepares, aids, assists and advises with respect to the
4    preparation of his customers' tax returns and other related documents that he
5    knows would, if used, result in understatements of his customers' tax liability.

6          124. If Alexander is not enjoined, he is likely to continue to promote tax-
7    fraud schemes.

8    **COUNT II:**          **Injunction Under I.R.C. § 7402 For Unlawful Interference**
                          **With Enforcement Of The Internal Revenue Laws And The**
9                         **Appropriateness of Injunctive Relief**

10          125.  The United States incorporates by reference the allegations in
11    paragraphs 1 through 124.

12          126.  Section 7402 of the I.R.C. authorizes a court to issue orders of
13    injunction as may be necessary or appropriate for the enforcement of the internal
14    revenue laws.

15          127.  Alexander, through the actions described above, has engaged in
16    conduct that substantially interferes with the administration and enforcement of
17    the internal revenue laws.

18          128. Alexander's conduct results in irreparable harm to the United States.
19    Alexander's conduct is causing and will continue to cause substantial revenue loss
20    to the United States Treasury, much of which may be unrecoverable.

21          129.  Unless Alexander is enjoined, the IRS will have to continue devoting
22    substantial time and resources auditing each of Alexander's customers
23    individually and assessing taxes, interest and penalties, some portion of which
24    may be impossible to recover.

25          130.  If Alexander is not enjoined, he is likely to continue to engage in
26    conduct subject to penalty under I.R.C. §§ 6700 and 6701 that interferes with the
27    enforcement of the internal revenue laws.

28                                      - 29 -

WHEREFORE, plaintiff, the United States of America, respectfully prays for the following:

A.  That the Court find that defendant has engaged in conduct subject to penalty under I.R.C. § 6700 and 6701 and that injunctive relief under I.R.C. §7408 is appropriate to prevent  recurrence of this conduct;

B.  That the Court find that defendant has engaged in conduct interfering with the enforcement of the internal revenue laws, and that injunctive relief is appropriate to prevent the recurrence of that conduct pursuant to the Court's inherent equity powers and under I.R.C. § 7402(a);

C.  That pursuant to I.R.C. §§ 7402 and 7408, Alexander and anyone acting in concert with him be permanently enjoined and restrained from, directly or indirectly, by use of any means or instrumentalities:

    i.    Organizing, promoting, marketing, or selling any plan or arrangement – including but not limited to the tax schemes described in this complaint and any other fraudulent tax scheme identified through further discovery in this case – that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of their federal tax liabilities;

    ii.    Engaging in conduct subject to penalty under I.R.C. § 6700, *i.e.*, the making, furnishing, or causing another to make or furnish material and false or fraudulent statements regarding the allowability of certain deductions, the excludability of income, or the securing of tax benefits derived from participation in any plan or arrangement, which he knows or has reason to know are false or fraudulent or making, furnishing, or causing another to make a gross valuation overstatement as to any material matter;

- 30 -

iii.     Engaging in conduct subject to penalty under I.R.C. § 6701, *i.e.*, preparing or assisting in the preparation of, or advising with respect to a document related to a matter material to the internal revenue laws that includes a position that he knows will, if used, result in an understatement of tax liability;

iv.     Engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws; and

v.     Preparing or aiding, assisting, and or advising with respect to the preparation of any federal tax return or representing customers before the IRS.

D.   That this Court, pursuant to I.R.C. §§ 7402 and 7408, enter an injunction requiring Alexander to contact, within thirty days of the Court's order, all individuals and entities to whom Alexander has provided any type of tax advice, and to inform these individuals and entities about of the Court's findings and the fact that an injunction has been entered against him;

E.   That this Court, pursuant to I.R.C. §§ 7402 and 7408, enter an injunction requiring Alexander to produce to the United States, within thirty days of the Court's order, any records in his possession, custody or control, identifying the names, addresses, telephone numbers, e-mail addresses, and Social Security and federal tax identification numbers of all persons and entities to whom Alexander has provided any type of tax advice;

F.   That the Court order that the United States is permitted to engage in post-injunction discovery to ensure compliance with the permanent injunction;

G.   That this Court retain jurisdiction over this action for purposes of implementing and enforcing this Final Judgment of Permanent Injunction;

H.   That this Court grant the United States such other and further relief, including costs, as is just and reasonable.

1    Dated: August 19, 2010              Respectfully submitted by:

2

3                                  ANDRÉ BIROTTE JR
                                  United States Attorney

4

5

6                                  ALLYSON B. BAKER
                                  D.C. Bar No.  478073

7                                  SEAN M. GREEN
                                  VA Bar No. 73560

8                                  Trial Attorneys, Tax Division
                                  U.S. Department of Justice

9                                  Post Office Box 7238
                                  Washington, D.C. 20044

10                                Telephone: (202) 353-8031
                                Facsimile:  (202) 514-6770

11                                Email: allyson.b.baker@usdoj.gov

12                                Attorneys for the United States

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    - 32 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV10- 6341 CBM (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
    **312 N. Spring St., Rm. G-8**
    **Los Angeles, CA 90012**

[ ] **Southern Division**
    **411 West Fourth St., Rm. 1-053**
    **Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
    **3470 Twelfth St., Rm. 134**
    **Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | WILLIAM W. ALEXANDER (see attached) |

| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): Los Angeles | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): Los Angeles |
|---|---|

| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>United States Attorney's Office<br>Daniel Layton, Asst. U.S. Attorney<br>300 N. Los Angeles St. Room 7211<br>Los Angeles, CA 90012  (213) 894-6165 | Attorneys (If Known) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
26 U.S.C. Sections 7402(a) and 7408

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☒ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No ☐ Yes
If yes, list case number(s):

CV10 6341

**FOR OFFICE USE ONLY:**   Case Number: _____

CV-71 (07/05)

CIVIL COVER SHEET

Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

---

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

---

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☑ Check here if the U.S. government, its agencies or employees is a named plaintiff.
   Los Angeles

List the California County, or State if other than California, in which **EACH** named defendant resides.  (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
   Los Angeles

**List the California County,** or State if other than California, in which **EACH** claim arose.  (Use an additional sheet if necessary)
**Note:** In land condemnation cases, use the location of the tract of land involved.
   Los Angeles

---

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date _____ 8/25/10 _____

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

---

Andre Birotte, Jr., United States Attorney
Sandra R. Brown, Assistant United States Attorney
Chief, Tax Division
Daniel Layton,  Asst.  United States Attorney
300 N. Los Angeles Street, Room 7211
Los Angeles, CA 90012   (213) 894-6165

ORIGINAL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

PLAINTIFF(S)

v.

WILLIAM W. ALEXANDER, RETIREMENT
PLAN SERVICES, INC., and LYONS PENSIONS,
INC.

DEFENDANT(S).

CASE NUMBER

CV10 6341-CBM(Ex)

**SUMMONS**

TO:    THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney
Daniel Layton
                                                     , whose address is:

United States Attorney's Office
300 N. Los Angeles Street Room 7211
Los Angeles, CA 90012
Tel: 213-894-6165 Fax: (213) 894-0115
Email:  DanielLayton@usdoj.gov

an answer to the ☒ complaint ☐_____amended complaint ☐ counterclaim ☐ cross-claim
which is herewith served upon you within __21__ days after service of this Summons upon you, exclusive
of the day of service. If you fail to do so, judgement by default will be taken against you for the relief
demanded in the complaint.

Clerk, U.S. District Court

Dated:    **2 5 AUG 2010**

By: _____

Deputy Clerk

*(Seal of the Court)*

CV-01A (01/01)                                **SUMMONS**